UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| MELISSA WILKES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 4:16-CV-038 JD |
| | ) |
| CARESOURCE MANAGEMENT | ) |
| GROUP CO. et al., | ) |
| | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Plaintiffs Melissa and Benjamin Wilkes received five calls to their cellphone from their former health insurance provider. They allege that the calls were placed without their consent and in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, so they filed this suit, asserting claims not only on their own behalf, but also on behalf of a putative class of individuals who have received similar calls. The defendants, CareSource Management Group, Co., and CareSource Indiana, Inc., are non-profit organizations that provide health insurance through the Health Insurance Marketplace. They have moved to dismiss the Plaintiffs' claims for lack of standing, and they separately moved to strike the class allegations from the complaint. For the reasons that follow, both motions are denied.

**I. FACTUAL BACKGROUND**

Plaintiffs Melissa and Benjamin Wilkes received health insurance coverage from CareSource beginning in 2013. They obtained this coverage after submitting an application to the Health Insurance Marketplace. In January 2016, they terminated their coverage with CareSource, which was notified of the termination by a form document generated through and sent to CareSource by the Marketplace. In April 2016, after the coverage had already been terminated,

CareSource placed at least five automated phone calls to the Plaintiffs' cellular telephone number. The Plaintiffs jointly paid for that number, though Melissa primarily used it. Some of the calls were addressed to Melissa, and others were addressed to Benjamin, but they did not answer all of the calls. On April 27, 2016, Melissa received one such call, which used an artificial or prerecorded voice that asked her to call back at a toll-free number to receive "some important information." Melissa called the number and was routed to an automated message that offered her health insurance coverage for 2016. The Plaintiffs allege that these calls "were unwelcome, invaded their peace and privacy, caused disruption and distraction, were annoying, caused frustration, and otherwise wasted their time," so they filed this suit. [DE 10 ¶ 47].

## II. DISCUSSION

The Plaintiffs assert claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227. As relevant here, the TCPA makes it unlawful to make any call to a cell phone using an "automatic telephone dialing system" (an auto-dialer) or an artificial or prerecorded voice, without the prior express consent of the called party. § 227(b)(1)(A)(iii). The TCPA further provides a private right of action for violations of that provision, and allows plaintiffs to recover either actual damages or statutory damages in the amount of $500 for each call, or up to $1500 per call for willful violations. § 227(b)(3). In their amended complaint, the Plaintiffs allege that the five calls they received on their cell phone from CareSource were placed with auto-dialers and used artificial or prerecorded voices. They further allege that they had not given consent to receive such calls, and that even if they had, their consent would have been revoked when they terminated their coverage with CareSource. They seek statutory damages for each of the calls, and also seek to represent a class of plaintiffs that received similar calls from CareSource.

CareSource moved to strike the class allegations in the Plaintiffs' complaint, arguing that the Plaintiffs' claims are facially incapable of satisfying the requirements for class certification,

so the class allegations should be stricken and this action should proceed only as to the Plaintiffs' individual claims. CareSource later moved to dismiss for lack of standing, too, arguing that the Plaintiffs have not alleged that they suffered any injury in fact. Because standing is a jurisdictional question that affects a court's authority to hear a case, the Court addresses that motion first.

**A.    Standing**

CareSource moves to dismiss the Plaintiffs' complaint for lack of standing.[1] In particular, it argues that under the Supreme Court's recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), the Plaintiffs have not suffered a concrete injury as a result of the alleged statutory violation. "Article III of the Constitution limits federal judicial power to certain 'cases' and 'controversies,' and the 'irreducible constitutional minimum' of standing contains three elements." *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 us 555, 559–60 (1992)). To establish Article III standing, a plaintiff must show that "(1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

---

[1] CareSource also suggests in passing that the Court lacks subject matter jurisdiction because the Hobbs Act precludes district courts from reviewing regulations promulgated by the FCC, which CareSource argues are dispositive here. The argument is both undeveloped and frivolous, but the Court addresses it given its independent duty to ensure it has subject matter jurisdiction. As the Seventh Circuit explained in *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 n.3 (7th Cir. 2010), "[a]lthough the Hobbs Act prevents the district court from considering the validity of final FCC orders, the court retains jurisdiction to determine whether the parties' actions violate FCC rules." Thus, even if CareSource is correct that the FCC's regulations (which this Court lacks authority to invalidate) are dispositive, all that would mean is that the Court is required to adjudicate these claims in CareSource's favor, not that it lacks jurisdiction to adjudicate them at all. That is shown by the case CareSource cites in support of its argument, *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302 (11th Cir. 2015), which dismissed the claims for failure to state a claim, not for lack of subject matter jurisdiction.

injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "To meet this burden and to survive a challenge to standing under Rule 12(b)(1), a plaintiff must plead sufficient factual allegations, taken as true, that 'plausibly suggest' each of these elements." *Berger v. NCAA*, No. 16-1558, 2016 WL 7051905, at *1 (7th Cir. Dec. 5, 2016) (quoting *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015)).

In *Spokeo*, the Supreme Court addressed the first element of standing, and reiterated that a plaintiff's injury must be both concrete and particularized. 136 S. Ct. 1540. There, the plaintiff asserted a claim under the Fair Credit Reporting Act, alleging that the defendant published false information about his age, employment, and education, in violation of the statutory requirement that a consumer reporting agency follow reasonable procedures to assure maximum possible accuracy of consumer reports. The Ninth Circuit held that the plaintiff had standing to pursue his claims because he alleged that the defendant violated his statutory rights and he had an individual interest in the handling of his credit information. The Supreme Court held, though, that while that made the plaintiff's injury "particularized," it was not necessarily sufficient to establish that the injury was "concrete," which is a distinct concept. 136 S. Ct. at 1548. To be "concrete," the Court explained, an "injury must be '*de facto*'; that is, it must actually exist." *Id.* In other words, the injury must be "'real,' and not 'abstract.'" *Id.*

The Court also emphasized, however, that "'concrete' is not . . . necessarily synonymous with 'tangible.'" *Id.* at 1549. "Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete." *Id.* In determining whether an intangible harm constitutes sufficiently concrete injury, "both history and the judgment of Congress play important roles." *Id.* As to the former, the Court noted that "it is instructive to consider whether

an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* As to the latter, the Court noted that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," and can "define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before." *Id.* That does not mean, though, that Congress can "erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing." *Id.* at 1547–48. Thus, a plaintiff cannot, for example, "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549. Finally, the Court noted that "the risk of real harm" can sometimes satisfy the concreteness requirement, and that in certain circumstances, a plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.* Ultimately, the Supreme Court remanded the case for further consideration, leaving it to the lower courts to decide whether the plaintiff met this standard.

Despite offering no definitive holding on the issue and breaking little new ground, *Spokeo* has spawned motions to dismiss in numerous cases involving statutory causes of action based on violations of statutory duties, including in cases like this one that arise under the TCPA. Neither party has cited any decision from a court of appeals since *Spokeo* resolving a challenge to standing on a TCPA claim in particular, but many district courts have addressed the issue. The majority of those courts have denied the motions to dismiss, finding that a violation of the TCPA constitutes concrete harm, though some courts have held to the contrary. *Compare LaVigne v. First Cmty. Bancshares, Inc.*, No. 1:15-cv-934, 2016 WL 6305992, at *6 (D.N.M. Oct. 19, 2016) ("The Court finds that a violation of the TCPA constitutes a 'concrete' harm for an Article III injury-in-fact requirement. Most courts that have addressed this issue have sided with

5

Plaintiff."), *with Romero v. Dep't Stores Nat'l Bank*, No. 15-cv-193, 2016 WL 4184099 (S.D. Cal. Aug. 5, 2016) (granting motion to dismiss a TCPA claim for lack of standing). Of the district courts within the Seventh Circuit that have addressed this issue, all have held that a violation of the TCPA gives rise to a concrete injury under Article III. *E.g.*, *Griffith v. ContextMedia, Inc.*, No. 16 C 2900, 2016 WL 6092634 (N.D. Ill. Oct. 19, 2016); *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, No. 12 C 9431, 2016 WL 6037625, at *9 n.3 (N.D. Ill. Oct. 14, 2016) *Dolemba v. Ill. Farmers Ins. Co.*, No. 15 C 463, 2016 WL 5720377 (N.D. Ill. Sept. 30, 2016); *Aranda v. Caribbean Cruise Line, Inc.*, No. 12 C 4069, 2016 WL 4439935 (N.D. Ill. Aug. 23, 2016); *A.D. v. Credit One Bank, N.A.*, No. 14 C 10106, 2016 WL 4417077 (N.D. Ill. Aug. 19, 2016).

The Court is persuaded by and adopts the reasoning in those cases. In particular, the Court concurs with the analysis in *Aranda*, which found that an alleged violation of the TCPA is enough to satisfy the concreteness requirement:

> The Supreme Court's point in *Spokeo* was not that a statutory violation cannot constitute a concrete injury, but rather that where the bare violation of a statute conferring a procedural right could cause a congressionally identified harm or material risk of harm and just as easily could not, it is not sufficient simply to allege that the statute at issue was violated. Failure to ensure the accuracy of a consumer report may result in a harm or material risk of harm the FCRA was intended to curb—loss of employment opportunities, for example, or a decrease in the consumer's creditworthiness. But it may also fail to cause any harm or material risk of harm at all. Put differently, the procedural rights imposed through section 1681e(b) [of the FCRA] are attenuated enough from the interests Congress identified and sought to protect through the FCRA that charging a defendant with violating them is not necessarily the same as charging the defendant with causing a congressionally-identified concrete injury that gives rise to standing to sue.
>
> The same cannot be said of the TCPA claims asserted in this case. Unlike the statute at issue in *Spokeo* . . . , the TCPA section at issue does not require the adoption of procedures to decrease congressionally-identified risks. Rather, section 227 of the TCPA prohibits making certain kinds of telephonic contact with consumers without first obtaining their consent. It directly forbids activities that by their nature infringe the privacy-related interests that Congress sought to protect by enacting the TCPA. There is no gap—there are not some kinds of violations of section 227 that do not

result in the harm Congress intended to curb, namely, the receipt of unsolicited telemarketing calls that by their nature invade the privacy and disturb the solitude of their recipients.

In any event, section 227 establishes substantive, not procedural, rights to be free from telemarketing calls consumers have not consented to receive. Both history and the judgment of Congress suggest that violation of this substantive right is sufficient to constitute a concrete, *de facto* injury. As other courts have observed, American and English courts have long heard cases in which plaintiffs alleged that defendants affirmatively directed their conduct at plaintiffs to invade their privacy and disturb their solitude. *See, e.g.*, *Mey v. Got Warranty, Inc.*, —— F.Supp.3d ——, ——, 2016 WL 3645195, at *3 (N.D.W.V.2016) ("[T]he TCPA can be seen as merely liberalizing and codifying the application of [a] common law tort to a particularly intrusive type of unwanted telephone call."); *Caudill v. Wells Fargo Home Mort., Inc.*, No. 5:16–066–DCR, 2016 WL 3820195, at *2 (E.D. Ky. July 11, 2016) ("[The] alleged harms, such as invasion of privacy, have traditionally been regarded as providing a basis for a lawsuit in the United States."). And Congress enacted the TCPA to protect consumers from the annoyance, irritation, and unwanted nuisance of telemarketing phone calls, granting protection to consumers' identifiable concrete interests in preserving their rights to privacy and seclusion.

. . . .

. . . In contrast to statutes that impose obligations regarding how one manages data, keeps records, or verifies information, section 227 of the TCPA directly prohibits a person from taking actions directed at consumers who will be actively touched by that person's conduct. It does not matter whether plaintiffs lack additional tangible harms like loss of cell phone battery life, actual annoyance, and financial losses; Congress has identified that such unsolicited telephonic contact constitutes an intangible, concrete harm, and plaintiffs have alleged such concrete harms that they, themselves suffered. Their injuries are concrete and particularized, traceable to defendants' conduct, and judicially redressable.

*Aranda*, 2016 WL 4439935, at *5–6.

The analysis of the district court in *Mey v. Got Warranty, Inc.*, No. 5:15-cv-101, 2016 WL 3645195 (N.D.W.V. June 30, 2016) is also persuasive. There, the court noted that unwanted phone calls placed in violation of the TCPA can give rise to tangible injuries, such as causing the plaintiff to incur charges for calls or depleting a cell phone's battery. *Id.* at *3. More importantly, those calls also cause intangible harm, including "(1) invasion of privacy, (2) intrusion upon and occupation of the capacity of the consumer's cell phone, and (3) wasting the consumer's time or

7

causing the risk of personal injury due to interruption and distraction." *Id.* Those intangible harms are analogous to injuries that are actionable under the common law, such as through claims for intrusion upon seclusion and trespass to chattels, and Congress identified them as the types of harms it sought to redress through the TCPA. *Id.* at *3–7. Thus, both history and Congress' judgment support a conclusion that a violation of the TCPA gives rise to concrete harm.

The Court is not persuaded by the reasoning of the cases that have found that TCPA plaintiffs lacked standing. Those cases have typically rested on the conclusion that the plaintiffs' injuries were "divorced from the alleged violation of the TCPA," because the calls are only actionable under the TCPA when they are placed with auto-dialers or use artificial or prerecorded voices, but the plaintiffs cannot trace their harm to the defendants' use of an auto-dialer or artificial or prerecorded voices in particular. *Romero*, 2016 WL 4184099, at *6. This logic confuses the existence of an injury with the availability of a cause of action. The injuries at issue are caused by the placing of unwanted phone calls, as just described. That the TCPA only proscribes such calls when made with auto-dialers or artificial or prerecorded voices does not mean that the existence of an injury for Article III purposes depends on whether those means are used, but only that plaintiffs do not have a cause of action when they are not. *Ung v. Universal Acceptance Corp.*, No. CV 15-127, 2016 WL 4132244, at *2 (D. Minn. Aug. 3, 2016) ("The manner in which the call was placed has no bearing on the existence of the injury; the use of an autodialer might increase the possibility of a plaintiff receiving hundreds or thousands of phone calls, thus perhaps increasing the *extent* of the invasion of his privacy, but it is the fact of the call (or calls) that creates the injury sufficient to confer standing."); *see also LaVigne*, 2016 WL 6305992, at *6 (finding that *Romero's* analysis "conflates the *means* through which [the

defendant] (allegedly) violated the TCPA with the *harm* resulting from that alleged violation"). Nor is the injury divorced from the violation, as the auto-dialers or artificial or prerecorded voices must have been used to place the very calls that caused the injury.

The Court therefore finds that the Plaintiffs here have adequately alleged that they suffered a concrete injury so as to satisfy Article III's injury-in-fact requirement. As in *Aranda*, "the intangible, concrete injury plaintiffs allege is that defendants violated a right Congress sought to protect through section 227: the right to be free from prerecorded non-emergency telemarketing calls they did not consent to receive." 2016 WL 4439935, at *6. The Plaintiffs' allegation that they received such calls is thus sufficient to allege a concrete injury. *Credit One Bank*, 2016 WL 4417077, at *7 ("It would be redundant to require a plaintiff to allege that her privacy and solitude were breached by a defendant's violation of section 227, because Congress has provided legislatively that a violation of section 227 is an invasion of the call recipient's privacy."). Moreover, to the extent any additional factual allegations are required to establish a concrete injury, the Plaintiffs have supplied them. They allege that the calls were "unwelcome, invaded Plaintiffs' peace and privacy, caused disruption and distraction, were annoying, caused frustration, and otherwise wasted their time," and that each of the calls "depriv[ed] them of the use of their property for their own purposes at the time the calls were placed." [DE 10 ¶ 24].

Finally, CareSource argues that even if Melissa Wilkes has standing, Benjamin Wilkes does not, because there is no allegation the he personally received the calls in question. As just discussed, though, the existence of a concrete injury does not depend on whether the plaintiff actually received and was annoyed or distracted by the call. Intrusion upon and occupation of the capacity of a plaintiff's phone can give rise to a concrete injury, and the unwelcome calls at issue here would have done that to the phone in question, of which Benjamin was a joint owner, thus

9

giving Benjamin a concrete, if intangible, injury. *Mey*, 2016 WL 3645195, at *3 ("Even if the consumer does not answer the call or hear the ring tone, the mere invasion of the consumer's electronic device can be considered a trespass to chattels, just as 'placing a foot on another's property' is trespass." (quoting *Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring) (alteration omitted))).

Moreover, the allegations in the complaint do not show that Benjamin was as distanced from the calls as CareSource argues. Though the complaint alleges that the phone "was primarily used by Melissa Wilkes," it further alleges that the calls were placed to the "*Plaintiffs'* phone number," which belonged to a cell phone for which Benjamin and Melissa jointly paid; that some of the calls were addressed to Benjamin; and that "[e]ach of the calls placed by CareSource to Plaintiffs was unwelcome, invaded *Plaintiffs'* peace and privacy, caused disruption and distraction, were annoying, caused frustration, and otherwise wasted *their* time." [DE 10 ¶¶ 19, 20, 24 (emphases added)]. Those allegations are sufficient to plausibly allege that both Melissa and Benjamin Wilkes suffered a concrete injury so as to meet Article III's injury-in-fact requirement. Therefore, the Court denies CareSource's motion to dismiss for lack of standing.

**B.     Class Allegations**

CareSource also moves to strike the class allegations from the complaint. Though this case is only at the pleading stage and the Wilkes have not yet filed a motion to certify a class, CareSource has preemptively moved to strike the class allegations, arguing that it is apparent from the face of the complaint that the Wilkes will be unable to meet the requirements for class certification. In particular, CareSource argues that the Plaintiffs' claims will depend on individualized questions as to whether they consented to receive the calls and whether they

revoked their consent prior to receiving the calls, so they will be unable to meet the predominance requirement for proceeding as a class action.[2]

Rule 23(c)(1)(A) directs that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A); *see also* Fed. R. Civ. P. 23(d)(1)(D) (permitting a court to "require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly"). Although "[m]ost often it will not be 'practicable' for the court to do that at the pleadings stage, . . . sometimes the complaint will make it clear that class certification is inappropriate." *Hill v. Wells Fargo Bank, N.A.*, 946 F. Supp. 2d 817, 829 (N.D. Ill. 2013). "In those situations, a court may determine that class certification is inappropriate before the parties conduct class discovery." *Blankenship v. Pushpin Holdings, LLC*, No.14 C 6636, 2015 WL 5895416, at *14 (N.D. Ill. Oct. 6, 2015); *see also Wright v. Mishawaka Hous. Auth.*, No. 3:15-cv-532, 2016 WL 7013875, at *6 (N.D. Ind. Dec. 1, 2016). "If the plaintiff's class allegations are facially and inherently deficient, for example, 'a motion to strike class allegations . . . can be an appropriate device to determine whether [the] case will proceed as a class action.'" *Id.* (quoting *Bohn v. Voiron, Inc.*, No. 11 C 8704, 2013 WL 3975126, at *5 (N.D. Ill. Aug. 1, 2013)). If, on the other hand, the dispute concerning class certification is factual in nature and "discovery is needed to determine whether a class should be certified," a motion to strike class allegations at the pleading stage is premature. *Wright v. Family Dollar, Inc.*, No. 10 C 4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010).

---

[2] CareSource also mentions in passing that the Plaintiffs will be unable to satisfy the typicality and adequacy requirements, too. However, those arguments—each of which occupies a single sentence in CareSource's opening brief—are waived as undeveloped and unsupported, and are premature at this stage anyway.

11

To obtain class certification under Rule 23, a plaintiff must satisfy the requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one subsection of Rule 23(b). Fed. R. Civ. P. 23(a), (b); *Harper v. Sheriff of Cook Cty.*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Rule 23(b)(3), on which the parties focus here, permits a class action when "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). While similar to Rule 23(a)'s requirements for typicality and commonality, "the predominance criterion is far more demanding." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012). "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (internal quotation omitted). "'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.'" *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

CareSource argues that the Plaintiffs cannot satisfy the predominance requirement because each potential class member's claim would require individual inquiries into whether that class member provided consent and, if so, whether they revoked that consent prior to the call. CareSource correctly notes that it is not uncommon for individual questions as to consent and revocation to defeat a putative class action due to the predominance requirement. *E.g.*, *Wolfkiel*

*v. Intersections Ins. Servs. Inc.*, 303 F.R.D. 287, 293–94 (N.D. Ill. 2014); *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106 (N.D. Ill. 2013) (collecting cases). It is also not uncommon, though, for TCPA cases to be certified as class actions, even when issues of consent and revocation are present. *E.g.*, *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492–93 (N.D. Ill. 2015) (certifying a TCPA class action where "common questions at the heart of this class's suit . . . include whether, as a matter of law, providing a cellular telephone number for verification purposes constitutes prior express consent to receive prescription refill reminder calls"); *Balbarin v. N. Star*, No. 10 C 1846, 2011 WL 211013 (N.D. Ill. Jan. 21, 2011). The court in *Jamison* attributed these different outcomes to the following distinction: "[I]ssues of individualized consent predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone. However, if the defendants fail to set forth this specific evidence and instead only make vague assertions about consent, then individualized issues regarding consent will not predominate over common questions of law or fact so as to prevent class certification." *Jamison*, 290 F.R.D. at 106–07.

The role that evidence set forth by a defendant plays in resolving the predominance inquiry presents an obstacle to CareSource's request to resolve this issue based on the Plaintiff's complaint, and ultimately dooms its request to strike the class allegations at this stage. If, as CareSource asserts, it gathered consent for the calls in question through individualized circumstances, then the Plaintiffs may well fail to meet the predominance requirement, in which case class certification would be denied. The same could be true for revocation of any consent. However, the allegations in the complaint do not compel such a finding at this stage. Rather, they permit a plausible inference that any consent or revocation arose through systematic processes

13

that would be uniform across the class. As to revocation, the Plaintiffs allege that any consent they may have given was revoked when they terminated their health insurance coverage, which they did through a standardized form that was generated through and sent to CareSource by the Health Insurance Marketplace. Whether such an action operates to revoke consent under the TCPA could be determined based on the same evidence for each class member that likewise terminated their coverage with CareSource—the common question is whether terminating coverage from a provider operates to revoke consent to be called by that provider, and the resolution of that question will not (so far as it appears at the pleading stage) depend on evidence unique to each class member. *See Wolfkiel*, 303 F.R.D. at 294 (denying a motion to strike class allegations where the same evidence would be used for each member of the class to determine consent).

As to consent (which is an affirmative defense), the Plaintiffs' complaint does not admit that they ever gave consent or provided their phone number directly to CareSource in the first place. As Plaintiffs argue in their response brief, CareSource may have obtained their phone number through standardized forms, perhaps generated through the Marketplace, which they used to enroll in CareSource's plan. In that case, common questions could still predominate even if CareSource raises a consent defense, as the question would then be whether those standard forms, which could be common across the class, give rise to consent to receive the calls in question. For example, in *Kolinek*, the parties disputed whether the plaintiff gave consent to receive the calls in question and whether the calls the plaintiff received were within the scope of that consent. 311 F.R.D. at 488. Nonetheless, the court certified a class action, finding that the predominance requirement was met where the defendant collected the phone numbers in a common manner. *Id.* at 489, 492–93; *see also Wolfkiel*, 303 F.R.D. at 294 (declining to strike

class allegations due to a consent defense where the source of the alleged consent could be common for each class member); *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 686 (S.D. Fla. 2013) ("Whether the provision of a phone number on admissions paperwork equates to express consent is a question common to all class members, because all class members filled out paperwork at the time of treatment. On this defense, all class members will prevail or lose together, making this another common issue to the class.").

Therefore, the Court cannot conclude that the Plaintiffs' class allegations are facially and inherently deficient such that the complaint itself makes clear that class certification will be inappropriate. CareSource may be correct that the Plaintiffs face an uphill battle to achieving class certification, and the facts might ultimately develop in such a way that class certification would be improper. But at the pleading stage, the Plaintiffs have alleged facts sufficient to plausibly suggest that they will be able to meet the requirements for class certification, so they are entitled to commence discovery to support their claims. CareSource's motion to strike the class allegations is thus denied.

### III.  CONCLUSION

CareSource's motion to dismiss for lack of standing [DE 20] and its motion to strike class allegations [DE 12] are each DENIED.


SO ORDERED.

ENTERED:  December 9, 2016

       /s/ JON E. DEGUILIO
Judge
United States District Court